UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

NAF, MD,

    Plaintiff,

v.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY n/k/a UNUM,

    Defendant.

Civil Action No. _____

COMPLAINT

Plaintiff, NAF, MD [1], by way of Complaint against the Defendant, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY n/k/a UNUM, (hereinafter "Unum" or "Defendant"), by and through his attorneys, Rogers, Hofrichter & Karrh, LLC and Uscher, Quiat, Uscher & Russo, P.C., alleges as follows:

1. Plaintiff is a resident of the State of Georgia, with a primary residence located in Suwanee, Georgia.

2. Defendant, Unum, is a disability insurance carrier licensed to do business in the State of Georgia with a principal place of business in Chattanooga, Tennessee.

3. Jurisdiction and venue are proper in this Court pursuant to 28 USC § 1332 *et seq.* in that the parties are citizens of the United States and citizens who are domiciled in different states, the amount in controversy is in excess of $75,000.00.

---

[1] Plaintiff has used his initials instead of his full name to protect his privacy, his professional standing and the privacy and professional standing of his partners and Practice.

4. At all times relevant to this Complaint, the Plaintiff was a licensed physician who practiced diagnostic and interventional radiology as a partner in a private radiology practice (hereinafter "the Practice").

5. In 1995, during the course of his career as a physician, Plaintiff purchased disability income insurance from Provident Life and Accident Insurance Company, Policy No. 06-338-7141952 ("Policy"). Defendant Unum is the successor in interest to the Provident Life and Accident Insurance Company with respect to the said Policy.

6. The Policy insured Plaintiff for a monthly benefit of $10,000.00 in the event he became totally disabled from performing the "substantial and material duties of your occupation". The Policy also provided benefits for residual disability.

## *Material Facts*

7. Plaintiff has been a Board Certified Interventional and Diagnostic Radiologist since concluding his residency in 1993. For the past 22 years Plaintiff was first an employee and then a full partner/owner of a private radiology practice "the Practice". The Practice is a radiology practice located in the suburbs of Atlanta, Georgia. It has 29 physicians, and it is run by a three-member management committee and a managing partner.

8. Prior to May of 2023, Plaintiff was a full partner at the Practice. In addition to his full-time work as a radiologist, an integral part of Plaintiff's full-time work in the Practice was his service as a recurrently elected member of the Practice's management committee.

9. On the management committee, Plaintiff was responsible for overseeing billing, generating and reviewing productivity reports and evaluating the financial status of the Practice quarterly. In addition, management committee members served as round-the-clock liaisons between the Practice and the administrative officers, technology supervisors, and department lead associates of two Atlanta based hospitals where the Practice provided radiology services.

### *Plaintiff's Illness*

10. In 2020, Plaintiff began to experience disabling cognitive and behavioral changes which interfered with his professional obligations, as well as his personal life.

11. Plaintiff was subsequently diagnosed with Fronto-Temporal Dementia (FTD), a progressive neurological disorder which results from damage preferentially to the neurons distributed in the frontal and temporal lobes of the brain. There is no cure for FTD.

12. The FTD diagnosis was made by Gary Figiel, MD who is an expert in the field of neuropsychiatry.[2]

13. All of the signs, symptoms and imaging results which are present in the case of Plaintiff corroborate the FTD diagnosis. In fact, the FTD diagnosis in this case is based on an abnormal brain MRI and two successive abnormal PET scans as well as personality and behavioral changes in both his personal and professional life.

14. From a medical perspective, there is no question that Plaintiff suffers from FTD and that such an impairment has had an obvious effect on his ability to maintain his multiple professional responsibilities, specifically in the area of multi-tasking.

15. Despite his best efforts and his willingness to work extraordinarily long hours to try to manage his multiple responsibilities to the Practice, he was unable to keep up with his work and was falling further and further behind.

16. As work volume and steeply increasing work efficiencies became a daily demand, Plaintiff's relative productivity was declining across all spheres of his professional responsibilities at the Practice.

---

[2] Dr. Figiel's credentials as an expert in this highly specialized area of medicine are well-documented, as his CV reflects. (See **Exhibit B** attached hereto).

17. The work at the Practice involves both diagnostic and interventional radiology, and each physician is required to multitask. Plaintiff was having more and more difficulty managing multiple responsibilities simultaneously - - a requirement of being a partner at the Practice.

18. The Managers of the Practice were also receiving complaints from non-radiologist referring physicians about Plaintiff's relatively slow pace in handling his responsibilities, specifically in timely reading scans and dictating reports on hospital emergency room imaging studies.

19. Unfortunately, Plaintiff could not keep up with his share of the hospital work. He was taking too long to interpret the imaging studies and dictate the reports, which generated complaints not only from the emergency room physicians, but also from his Practice's colleagues.

20. As time passed, additional complaints about failure to meet established turn-around times came from departmental and hospital system administrators.

21. As the Practice's activities continued to ramp up after COVID, many of its physicians were becoming angry about Plaintiff's decreasing productivity. Some of the other partners in the firm were demanding that he be expelled from the Practice. Despite Plaintiff's best efforts to maintain his productivity, many of his colleagues became alienated from him, relationships became strained, egos were being bruised, and Plaintiff was becoming very defensive.

22. Other doctors at the Practice did not want to "take call" with Plaintiff because the allocation of work responsibilities would be disproportionate, as Plaintiff completed significantly less than half of the studies during a typical shared call assignment.

23. Dr. Figiel had strongly advised a reduction in any responsibilities that presented frequent interruptions to Plaintiff's performance of clinical care. Because of concerns regarding his ability to fulfill his substantial responsibilities as a member of the Practice's three-member

management committee, Plaintiff was compelled to relinquish his position on the management committee. Instead, Plaintiff tried to spend proportionally more time doing procedures and generating income for the Practice since his productivity was so much less profitable than his partners.

24. Plaintiff's status at the Practice had become untenable by 2023. Under intense pressure from his partners, and in order to avoid outright termination, Plaintiff ultimately agreed to comply with the medically indicated recommendations of his treating physician, which necessitated fundamental restructuring of his professional responsibilities at the Practice.

25. In addition to giving up his management responsibilities on the management committee, Plaintiff was reclassified as a "halftime" partner. This permitted him to do similar types of professional work, but at a much lower volume for fewer scheduled days, assignments with less demanding time constraints, which reduced by fifty (50%) percent the number of calls that he would have to cover jointly with other radiologists in the Practice. This substantial restructuring of his position at the Practice resulted in a sharp reduction in Plaintiff's income.

26. Even this drastic reduction in Plaintiff's work responsibilities proved inadequate. In October 2024, the management committee removed Plaintiff completely from the call pool scheduling for the upcoming January - April 2025 calendar. As a result, Plaintiff will no longer be eligible for partnership status and will return to employed status with even further markedly reduced compensation beginning January 1, 2025.

### *Plaintiff's Disability Claims*

27. Because he had experienced a substantial reduction in his income as a result of his FTD diagnosis although he continued to work in the Practice, Plaintiff filed a claim for residual disability benefits under his policy with Unum. At the same time, he also filed similar residual

disability claims with his two other disability insurers, Massachusetts Mutual and Northwestern Mutual.

28. Upon submission of his claim for residual disability benefits to Northwestern Mutual and Massachusetts Mutual, his other disability carriers, due to the FTD diagnosis and the symptoms of that condition, Plaintiff was approved for disability benefits in accordance with those policies and has remained on residual disability benefits since their timely approval.

29. Notwithstanding, based on precisely the same evidence upon which Massachusetts Mutual and Northwestern Mutual had timely approved benefits, Unum denied benefits under its policy, questioning Plaintiff's diagnosis and arguing that the neuropsychological testing performed was inconclusive to demonstrate that Plaintiff was cognitively impaired.

30. In denying the claim, Unum ignored the fact that Plaintiff was being treated by Gary Figiel, MD a nationally renowned expert in the field of neuropsychiatry and an expert in the highly specialized area of medicine applicable to an FTD diagnosis.

31. In response to Unum's wrongful denial of his claim, Plaintiff timely filed a comprehensive appeal with Unum which included certified statements from Dr. Figiel, and the certified personal observations of the manager of his Practice, as well as Plaintiff's wife.

32. Dr. Figiel pointed out that reliance on neuropsychological testing to question the FTD diagnosis was not appropriate and reflected a misunderstanding of the nature of FTD. He noted that neuropsychological testing is not designed to establish a diagnosis of FTD, so Unum's reliance on such test results to question the diagnosis was completely misplaced.

33. Even if such testing were relevant to an FTD diagnosis, the test results in Plaintiff's case further corroborates his cognitive decline. Though the neuropsychological test results are not in the "impaired" range, they nevertheless reflect a material decrement in the baseline cognitive facility of Plaintiff, whose pre-disability IQ exceeded 140.

34. Instead, Dr. Figiel explained that all of the signs, symptoms and imaging results present in the case of Plaintiff corroborate the FTD diagnosis, in that Plaintiff's FTD diagnosis is based on abnormal PET scans as well as personality and behavioral changes in both personal and professional life.

35. Plaintiff's PET scans reflected frontal lobe damage which would directly undermine Plaintiff's ability to multitask and would impair his processing speed. The anterior cingulate gyrus abnormalities on the two PET scans directly correlate with impaired processing speeds, decision-making, attention allocation, and other executive functions.

36. Further, Plaintiff was exhibiting certain behavioral changes which were inconsistent with his normal personality. The Plaintiff's PET scan abnormalities involving bilateral amygdala and other temporal lobe structures directly correlate with these disease manifestations.

37. The criteria by which an FTD diagnosis is made include the presence of behavioral disinhibition, declines in executive functioning, apathy, functional decline and abnormal scans. All of these conditions were present in the case of Plaintiff.

38. Notwithstanding that Plaintiff had been approved for disability benefits by Northwestern Mutual and Massachusetts Mutual based on precisely the same medical evidence submitted to Unum, on August 15, 2024, Unum refused to reconsider its denial of benefits to Plaintiff, never adequately explaining why it believed benefits were not payable in denying his appeal. Unum simply reiterated the language it used initially to deny the claim and offered no further explanation as to why the evidence of residual disability was inadequate.

### *Policy Provisions*

39. Plaintiff continues to work part-time, so his claim is for residual disability benefits under the policy. The policy defines residual disability as follows:

> "Residual Disability or residually disabled, during the elimination period, means that due to injuries or sickness:

1. You are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;

2. You have a loss of monthly income in your occupation of at least 20%.

After the elimination period has been satisfied, you are no longer required to have a loss of duties or time. Residual disability or residually disabled then means that as a result of the same injuries or sickness you have a loss of monthly income in your occupation of at least 20%."

40. From any possible good faith perspective, Plaintiff meets the residual disability requirements of the Unum policy.

41. First, by having to relinquish his responsibilities on the management committee at the Practice as a direct result of his ongoing medical illness, physician mandated work restrictions, and the professional judgment of his two other management committee members, Plaintiff has clearly demonstrated that he is "not able to do one or more of your substantial and material daily business duties." This alone qualifies him for residual disability benefits.

42. Further, as demonstrated by the evidence submitted to Unum, Plaintiff is not able to do his "usual daily business duties for as much time as it would normally take to do them." Here again, the proof in support of Plaintiff's eligibility for residual disability benefits is overwhelming.

43. As to Plaintiff's loss of income, Unum has already acknowledged in writing that Plaintiff has suffered an enormous loss of income. His imaging count decreased by 45% and his charges decreased by 54%. Given the progressive nature of his disease, Plaintiff's percentage of lost income will increase at an unpredictable rate.

44. More to the point, by accepting his forced demotion to a part-time partner status, Plaintiff has incurred a loss of income of at least 50% since his disability. Plaintiff is clearly

residually disabled within the meaning of the Unum policy, and the denial of his claim is both wrongful and a breach of Unum's contract.

45. Defendant had no good faith basis to deny Plaintiff's disability benefits, and such denial was in bad faith.

### *Bad Faith*

46. On September 5, 2024, Plaintiff's counsel corresponded with Unum advising that its denial of benefits was in bad faith under Georgia law O.C.G.A. § 33-4-6 and demanded the claim be paid within 30 days.

47. Despite the demand, Unum refused to pay the claim, instead issuing a further denial of benefits on October 4, 2024, which again failed to explain why the claim was being denied.

48. This lawsuit ensued.

49. From a medical perspective, there is no question that Plaintiff suffers from FTD and that such an impairment is having a profound effect on his ability to maintain his multiple professional responsibilities specifically in the area of multitasking.

50. This is the conclusion reached by Plaintiff's two other disability carriers, and it is corroborated by his nationally renowned neuropsychiatrist Dr. Figiel, sequential abnormal PET scans, and the observed changes in Plaintiff's personality and his professional behavior.

### *Unum Has a History of Bad Faith Claims Handling*

51. Unum's behavior is consistent with its checkered corporate history, which involved substantial regulatory scrutiny, widespread claims manipulations, and nationwide sanctions and claims handling admonitions, including a $15 million fine, and a direction that it reopen 215,000 denied disability claims. *See, Regulatory Settlement Agreement ("RSA")* between Unum and the United States Department of Labor (2004).

52. Despite the years which have passed since that regulatory encounter, Unum apparently did not change its profit-minded claims handling philosophy, which appears to continue unabated. *Fifteen Years Later - - Did The Unum Group Improve Its Claims Handling Practices?* 39 Miss. C. L. Rev. 199 (2021).

## AS AND FOR A FIRST CAUSE OF ACTION

53. Plaintiff repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 52 as if fully set forth herein at length.

54. By virtue of the foregoing, the Defendant has breached its contract with the Plaintiff causing Plaintiff harm and damages.

## AS AND FOR A SECOND CAUSE OF ACTION

55. Plaintiff repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 54 as if fully set forth herein at length.

56. By virtue of the foregoing, Defendant has breached its duty of good faith and fair dealing, thereby damaging the Plaintiff.

## AS AND FOR A THIRD CAUSE OF ACTION

57. Plaintiff repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 56 as if fully set forth herein at length.

58. By virtue of the foregoing, Defendant has acted in bad faith in terminating benefits to the Plaintiff, knowing said decision was wrongful, knowing that same had no good faith basis, and knowing that such decision would substantially deprive Plaintiff of the benefit of his bargain when he purchased the said Policy.

59. By virtue of the foregoing, the Defendant has engaged in willful acts of misconduct resulting in a bad faith refusal to pay disability benefits to which Plaintiff is due under the said Policy.

60. By virtue of the foregoing, the Plaintiff is entitled to an assessment of punitive damages and all other remedies against the Defendant pursuant to O.C.G.A. § 33-4-6.

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of the Plaintiff and against the Defendant, adjudicating that Plaintiff is currently disabled within the meaning of the Policy, awarding him compensatory damages, punitive damages, double damages, costs and attorneys' fees as appropriate.

|  |  |  |
|---|---|---|
|  |  | ROGERS, HOFRICHTER & KARRH, LLC<br>225 S. Glynn Street, Suite A<br>Fayetteville, GA 30214<br>Phone  770-460-1118<br>Fax     770-460-1920 |
| Dated:  Nov.22, 2024 | By: | /s/Heather Karrh<br>HEATHER KARRH<br>Georgia Bar 408379<br>Email  hkarrh@rhkpc.com |
|  |  | USCHER, QUIAT, USCHER & RUSSO<br>A Professional Corporation<br>433 Hackensack Avenue, 2nd Floor<br>Hackensack, NJ 07601<br>Phone  201-342-7100<br>Fax     201-342-1810 |
| Dated: Nov. 22, 2024 | By: | /s/ Michael E. Quiat<br>MICHAEL E. QUIAT<br>Atty ID No. 015911985<br>Email  mquiat@uqur.com<br>(*Pro Hac Vice* Application forthcoming) |

***Attorneys for Plaintiff, NAF, MD***

11